Daniel L. Abrams (DA 7258)
Law Office of Daniel L. Abrams, PLLC
Attorney for Vincent P. Iannazzo
67 Wall Street, 22nd Floor
New York, New York 10005
(212) 245-1810



UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

VINCENT P. IANNAZZO

               Plaintiff,

v.

PITNEY HARDIN, LLP, f/k/a/ PITNEY HARDIN
KIPP & SZUCH, LLP, FREDERICK L.
WHITMER and BARRY MARK KAZAN

               Defendants

------------------------------------------------------------

**ECF CASE**

**JURY TRIAL DEMANDED**

**04 CV 07413**

**JUDGE CASEY**

## COMPLAINT FOR DAMAGES

    Vincent P. Iannazzo, through his undersigned counsel, brings this complaint for damages against defendants herein, and for reasons states:

### The Parties

    1.    Vincent P. Iannazzo ("Iannazzo") is a citizen of the State of Florida with a primary residence at 21949 Cartagena Drive, Boca Rotan, Florida.

    2.    Defendant Pitney Hardin, LLP f/k/a/ Pitney Hardin Kipp & Szuch, LLP ("Pitney Hardin") is a law firm partnership with a principal place of business in Morristown, New Jersey and another office in New York, New York.

3.    Defendant Frederick L. Whitmer ("Whitmer") is a former Pitney Hardin partner, and is, on information and belief, a citizen and resident of the State of New York. Mr. Whitmer is presently a partner in the New York office of Brown Raysman Millstein Felder & Steiner LLP.

4.    Defendant Barry Mark Kazan ("Kazan") is of counsel to Pitney Hardin, and is, on information and belief, a citizen and resident of the State of New York.

### Jurisdiction and Venue

5.    This Court has jurisdiction in this action pursuant to 28 U.S.C. §1332(a)(1), as the amount in controversy between the parties exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

6.    Venue is proper in this district pursuant to 28 U.S.C. §1391(a).

### General Allegations

7.    On or about September 1, 2002, Iannazzo and defendants entered into a Retainer Agreement, pursuant to which defendants agreed to represent Iannazzo in litigation surrounding a partnership dispute between Iannazzo and Milton E. Stanson ("Stanson"). Defendants also provided Iannazzo with advice and services on bankruptcy and transactional issues related to the bankruptcy of Emex Corporation ("Emex") and Emex subsidiaries North Star Exploration, Inc., North Star Zeus, Inc., and North Star Platinum, Inc. (the Emex subsidiaries are collectively referred to as "North Star").

8.    A primary issue in the partnership dispute was the question of who had previously owned a piece of real property located at 112 Nurmi Drive, Fort Lauderdale, Florida (the "Florida Property"). Iannazzo contended that he owned the Florida Property prior to selling it in February of 2002, while Stanson asserted the Florida Property was the asset of Universal, LLC, a partnership of Iannazzo and Stanson. Stanson claimed to have an interest in the proceeds of

Iannazzo's sale of the Florida Property.  Stanson further alleged that Iannazzo misled him into thinking that the Florida Property had not been sold at the time the parties signed agreements which eliminated any claim that Stanson had a right in the Florida Property (i.e., in March and April of 2002), and only learned of the sale when Steven Blank told him he saw a "House For Sale – Sold" sign posted at the Florida Property during the Memorial Day weekend (i.e., May 25-27) of 2002.

9.      A competent lawyer and law firm representing Mr. Iannazzo could have and would have been able to show that the Florida Property was Iannazzo's property alone, and that in any event, Stanson knowingly signed away any purported claim to the Florida Property or proceeds from its sale.  Stanson was only able to prevail on his claim that the Florida Property was a partnership asset through Defendants' deceit and malpractice, including Defendants' deliberate suppression of the most relevant non-party witnesses, and Defendants' deliberate acquiescence to easily-impeachable testimony that, only because of Defendants' malpractice and deceit, was credited by the trial court.

10.     On or about December 2, 2003, Justice Gammerman declared that the Florida Property was an asset of Universal LLC.  Justice Gammerman also dissolved the parties' partnership, directed an accounting, and enjoined Iannazzo from causing any transfer of his assets other than transfers as may be necessary for ordinary living expenses.  Justice Gammerman also, *inter alia*, nullified related agreements between Iannazzo and Stanson, and denied Iannazzo's claim of promissory estoppel.

11.     For Iannazzo, the consequences of losing this case were enormous.  Had the property been correctly determined to be Iannazzo's, he would have been able to retain the proceeds from the sale of the Florida Property, which he had consummated in February, 2002,

Moreover, Justice Gammerman's decision voided certain underlying agreements, the voiding of which further damaged Iannazzo by, *inter alia*, depriving Iannazzo his previously bargained-for rights. In addition, Defendants' deceit and malpractice precluded Iannazzo from purchasing a platinum deposit that was a major asset to be auctioned off in the Emex bankruptcy. Defendants were well aware of Iannazzo's intention (through Iannazzo's company, Evergreen Consolidated Holdings, LLC) to bid successfully for a portion of North Star's assets which included, *inter alia*, a 43,000 acre plot of land in the Tintina gold province of Alaska, and a portfolio of seven projects in various stages of exploration offering significant potential for mine discovery. Defendants were representing Iannazzo in connection with his intended purchase of these assets, and were well aware that their deceit and malpractice made such a purchase impossible. Iannazzo also had to hire counsel to monitor Defendants, and to defend against a contempt motion that was brought as the direct result of negligent advice provided by Kazan. Finally, Iannazzo has been devastated by Defendants' deceit and malpractice, and has suffered mental, emotional and physical damage as a result.

### Allegations of Deceit

12.     Numerous misrepresentations and omissions by defendants had the effect of (1) denying Iannazzo the ability to adequately prepare for trial, (2) excluding several critical witnesses from the trial, and (3) misleading the Court into an erroneous ruling.

### Misrepresenting The Law

13.     Defendants misrepresented the most relevant Partnership Law applicable to the case. Specifically, defendants Kazan and Whitner each repeatedly told Iannazzo that the documentary evidence in the case compelled judgment in Iannazzo's favor, and that witnesses were generally not needed (except as necessary to confirm or authenticate certain documents).

This misleading advice was first communicated near the beginning of the representation in approximately September 2002, when Whitmer told Iannazzo (in sum and substance), "Vincent, you have one of those rare cases where you don't need any witnesses." The sum and substance of this advice was repeated on many occasions by both Kazan and Whitmer throughout the representation. On one occasion in Whitmer's office weeks prior to trial, when Iannazzo was expressing skepticism about Defendants' rejection of corroborating witnesses, Whitmer pointed to a sketch of himself arguing in federal court and told Iannazzo, in sum and substance, "Vincent, you didn't even finish law school. I have been practicing for over 20 years. I know the law. Trust me."

14.    Even after losing at trial (but prior to an appellate determination), Kazan maintained Defendants' erroneous reading of applicable law, e-mailing Iannazzo on March 23, 2004:

> We remain firmly committed to the fact that the documentary evidence compels judgment in your favor. That has been and continues to be our strongest argument. No amount of testimony helps you in this case (be it deposition, audiotapes, or trial testimony).

15.    This fundamental misrepresentation of the dispositive law in the case was used as a pretext to justify many of the other misrepresentations that were made by Defendants on Iannazzo's behalf. Defendants insisted that only the documents matter, and used this false legal argument to justify, *inter alia*, failing to bring critical witnesses to trial.

### Deceitful Failure to Use Tapes To Impeach Stanson and his Witnesses

16.    Stanson secretly taped several conversations with Iannazzo and other relevant witnesses. In the course of discovery these tapes were disclosed to Defendants for use in Iannazzo's representation. These tapes were quite helpful to Iannazzo, as they revealed (1) Stanson's apparent admission that the Florida Property was Iannazzo's and Iannazzo's alone, and

(2) a discussion between Stanson and Stanson's witness Frank Hagan revealing an apparent plot between Stanson and Ray Nunn (another Stanson witness at trial) against Iannazzo before the signing of the settlement agreements that Justice Gammerman set aside because of Iannazzo's purported "fraud."

17.     Despite the fact that all of these tapes as well as certified translations were provided to Defendants at least several months prior to the trial, Defendants did not direct Iannazzo or the Court to critical portions of the transcripts prior to or during trial.  Most notably, Defendants did not advise Iannazzo or the Court that the tapes included Stanson's admission as well as the nefarious discussion whereby Stanson plotted against Iannazzo.  These transcripts should have been highlighted throughout the case, including in the cross examinations of Stanson, Nunn and Hagan.

18.     As Iannazzo's attorneys, defendants had both a common law duty and an ethical duty to apprise Iannazzo of both Stanson's critical admission and the apparent plot against their own client.

19.     Defendants' failure to mention or share these transcripts with their client was exacerbated by a misleading motion to exclude the tapes and transcripts from evidence.  The transcripts contained direct evidence substantiating Iannazzo's case, and would have led to Iannazzo prevailing at trial had they been in the hands of a competent attorney acting in good faith.  The motion to suppress was of course denied, apparently leaving Justice Gammerman (who served as both judge and fact-finder) the false impression that Iannazzo was hurt by the tapes and was desperate to find a technicality to avoid having Justice Gammerman consider them.

20.     Defendants misuse of the tapes continued through trial. Defendants failed to question Stanson, Nunn or Hagan on the most damning taped statements. The failure to cross-examine was exacerbated by the fact that, because of Defendants' deceit and malpractice, Iannazzo had no witnesses to rebut the testimony of Stanson, Nunn and Hagan. Moreover, Defendants left their client in the dark until it was too late. Iannazzo had no idea these admissions existed in evidentiary form until **after** the trial. Defendants also failed to adequately address Iannazzo's own statements on tape, and failed to prepare Iannazzo for his own testimony and cross-examination by Stanson's attorneys.

21.     After losing the trial and prior to service of the reply appellate papers, Defendants finally revealed to Iannazzo that the tapes contained helpful material. Defendants even suggested to Iannazzo that the admissions on the tapes would lead to a reversal of Justice Gammerman's decision. Defendants finally presented this testimony in their reply appellate brief. At that point, of course, it was too late, as the First Department was not in a position to weigh the credibility of witnesses before the trial court, nor were they authorized to conduct a *de novo* review of the case.

### Deceitful Failure to use Witnesses

22.     Many individuals were ready, willing and able to testify that the Florida Property belonged to Iannazzo and Iannazzo alone. Defendants interviewed some of these witnesses, billing Iannazzo for a substantial amount of time in the process. However, defendants failed to call witnesses that would have corroborated Iannazzo and the truth: the Florida Property belonged to Iannazzo, and in any event, Stanson willingly signed away any rights to the Florida Property with full knowledge of material facts.

### Judith Thoyer and the Thoyer Memo

23.     On June 26, 2003, Iannazzo informed Barry Kazan that he wanted a memo written by Judith Thoyer (the "Thoyer Memo") "brought to the attention of the judge wherever and whenever possible." Iannazzo's request was a sensible one: Ms. Thoyer was a Paul Weiss partner who had represented both Iannazzo and Stanson in the underlying Memorandum of Understanding, and the Thoyer Memo clearly corroborated Iannazzo's version of disputed events.

24.     Within weeks of the trial, defendant Barry Kazan represented to Iannazzo that Stanson's counsel at Bressler, Amery and Ross had consented to the inclusion of the Thoyer Memo as a trial exhibit. Iannazzo nevertheless insisted that Judith Thoyer be called as a witness, but Kazan said that it would not be necessary, given the Thoyer Memo.

25.     At trial, it became clear that Kazan had lied to Iannazzo when Stanson's counsel objected to inclusion of the Thoyer Memo as a trial exhibit, on the grounds that Defendants failed to turn over the Thoyer Memo in discovery, and Justice Gammerman sustained the objection. As a result, Justice Gammerman did not consider the Thoyer memo at trial. Nor did Judith Thoyer testify.

### The Coldwell Banker Lie

26.     In or around late August of 2003, Whitmer stated to Iannazzo that he had served a subpoena on Coldwell Banker to obtain documents and hopefully cooperation related to the upcoming trial. Coldwell Banker is the real estate agency that handled Iannazzo's February 2002 sale of the Florida Property. Whitmer further claimed that the subpoena would enable Defendants to use Coldwell Banker's evidence at trial.

27.     Coldwell Banker had critical evidence to offer, since Stanson's witness Steven Blank claimed in a deposition that he first learned of the sale of the

Florida Property what he saw a "For Sale - Sold" sign on Memorial Day Weekend of 2002. Coldwell Banker records and recollections reveal that (1) the Florida Property was sold on February 28, 2002, (2) the "for sale" sign was removed prior to the closing, and (3) no real estate sign was placed at or around the Florida Property thereafter. Therefore, Steven Blank was either mistaken or lying when he stated that he first saw the sign Memorial Day weekend, 2002. This, in conjunction with other evidence that either was or should have been before the trial Court, would have altered the outcome of the trial.

28.     After trial, Iannazzo learned for the first time that Defendants had not served Coldwell Banker with a subpoena.

### Failure To Use Edward Schweizer

29.     Defendants failed to use Edward Schweizer as a witness, falsely telling Iannazzo that his testimony was "irrelevant" since the documents alone compelled judgment for Iannazzo. Mr. Schweizer met with Whitmer and Kazan at Iannazzo's insistence, and told them, *inter alia*, of many conversations with Stanson whereby Stanson referred to the Florida Property as "Vincent's house."

### Failure To Use Diane Baker

30.     Defendants failed to use Diane Baker as a witness, falsely telling Iannazzo that her testimony was "irrelevant" since the documents alone compelled judgment for Iannazzo. Iannazzo had to practically beg Defendants to interview her. Defendants did reluctantly interview her, but discarded her potential testimony. Diane Baker was an Emex employee who served as a secretary for both Stanson and Iannazzo. Defendants interviewed her extensively, and she told Defendants that (1) the Florida Property was Iannazzo's and Iannazzo's alone, (2) this was common knowledge amongst Emex

employees, (3) she spoke with both Stanson and Iannazzo roughly four times a day

during much of 2001, and (4) Stanson would refer to the Florida property as "Vincent's."

Moreover, as an Emex employee, Diane Baker would have been in a position to rebut

Nunn's and Hagan's testimony.

### Failure to Use Dan Turturro

31.    Defendants failed to use Dan Turturro as a witness, again using their false

representation of the law to justify minimizing his potential use as a witness. Defendants

refused to interview Turturro, and failed to follow through on a promise to make a motion

to include an affidavit of Turturro in the appellate record. Dan Turturro supervised the

renovations of the Florida Property while Iannazzo owned it, and had direct

conversations with Stanson about the ownership of the Florida Property. His testimony

would have, *inter alia*, corroborated Iannazzo's ownership of the Florida Property.

### Failure to Use Michael Boyle

32.    Iannazzo retained private investigator Michael Boyle to investigate the

facts surrounding the Stanson litigation. The results of his investigation lended

substantial corroboration for the fact that Stanson and Blank had conspired against

Iannazzo to make it look like Iannazzo had defrauded Stanson. Boyle's investigative

report was memorialized in an August 2003 affidavit (the "Boyle Affidavit"). In the

weeks leading up to trial, Defendants Whitmer and Kazan each promised to bring the

Boyle Affidavit to Gammerman's attention.   Defendants nevertheless failed to bring the

Boyle Affidavit or potential Boyle testimony to the attention of Justice Gammerman.

### Other Witnesses Not Used

33.    Various other potential witnesses could have and should have been called by Defendants at trial. Defendants' misrepresentation to Iannazzo that the law compelled judgment in his favor without regard to witnesses was used as a pretext for not calling these witnesses. This left Iannazzo with no substantial corroborating witnesses at trial to show that the Florida Property was Iannazzo's, and no witnesses to impeach the false testimony introduced by the other side.

## Allegations of Scienter

34.    On information and belief, Defendants' misrepresentations that, *inter alia*, (1) the law compels judgment for Iannazzo, (2) "Vincent, you have one of those rare cases where you don't need any witnesses," (3) "no amount of testimony helps you in this case," (4) witnesses corroborating Iannazzo's ownership of the Florida Property (e.g., Dan Turturro, Diane Baker, Edward Schweizer, Michael Boyle, etc.) were not worth calling, (5) Coldwell Banker had been subpoenaed to provide testimony or documents for use at trial, (6) Michael Boyle's testimony would be brought to the Court's attention, and (7) both sides have agreed that the Thoyer Memo is evidence, were not the mere product of sloppy lawyering, but were knowingly false when made. On information and belief, these misrepresentations were knowingly directed at Iannazzo and the Court. Similarly, on information and belief, Defendants' failure to alert Iannazzo or the Court to the extremely helpful impeachment materials on the tapes was a deliberate attempt to deceive Iannazzo and the Court. For allegations showing strong circumstantial evidence of conscious and/or reckless misbehavior, Iannazzo makes the following allegations.

35.    Defendant Pitney Hardin is a highly regarded law firm.  Defendant Whitmer is an extremely well-educated and experienced litigator.  Defendant Kazan also brought substantial relevant experience and education to Iannazzo's representation.

36.    Defendants billed an enormous amount of time to this case.  Defendants billed by the hour, and racked up total fees and disbursements on behalf of Iannazzo of approximately $1,000,000, the vast majority of which concerned the partnership dispute and related matters.

37.    Experienced and well-educated attorneys billing such substantial time to a partnership law matter will (1) develop a basic understanding of applicable partnership law principles (if they did not have such an understanding already), and (2) read and understand the transcripts of conversations recorded by the adverse party and provided by opposing counsel before going to trial.  Such lawyers will also advise their clients of the applicable facts and law as necessary to understand the case for purposes of preparing for trial and/or settlement negotiations.

38.    A basic partnership law principle, which must have been known to Defendants prior to trial, is that partners owe fiduciary duties to one another.  Another basic tenet is that partnership property is often owned on paper by an individual partner.  Therefore, a determination of whether property is partnership property or owned by an individual partner will transcend a simple review of documents where there are allegations of fraud in the inducement and breach of fiduciary duty.

39.    Moreover, the misrepresentations concerning which witnesses would be subpoenaed or presented to the Court (i.e., Coldwell Banker, Thoyer and her memo, and Boyle) were plain in their falsity.  Had there been one such misrepresentation, it could

12

arguably be explained away as an honest mistake or miscommunication. Three misrepresentations -- along with the other misrepresentations alleged herein -- lead to a strong inference of intentional deceit.

40.     Defendants Whitmer and Kazan directed unprofessional conduct towards Iannazzo, some of which is specified herein, that indicate they were not undertaking a good faith effort on Iannazzo's behalf.

41.     During Iannazzo's deposition, Kazan, who was "defending" the deposition, assaulted Iannazzo in full view of opposing counsel

42.     Whitmer told Iannazzo on several occasions both before and after trial "I don't like this case." Whitmer also speculated incorrectly that the underlying partnership dispute was a divorce between two gay guys. During an intermission at trial, Whitmer put his arm around Iannazzo and said in sum and substance "so tell me Vincent, what does it feel like to get a really good blow job?"

43.     Kazan had several conversations with potential witness Jacqueline Tozzi in which he made inappropriate and sexually suggestive comments. He even made extended suggestive comments to Tozzi in Court during the first day of trial. After the first day of trial, he belittled Iannazzo in comments to Tozzi and told Tozzi that "Vincent is going to lose." This statement is especially troubling in light of the fact that Kazan had powerful impeachment materials that Defendants failed to use on the second day of trial, and only disclosed in time to add to the reply appellate brief.

44.     Sometime before trial, Kazan advised Iannazzo that he knew people in Louisiana who fix cases, either by paying off the judge or by paying off opposing counsel.

45.     Defendants repeatedly failed to follow Iannazzo's lawful instructions. Whitmer even e-mailed Iannazzo on one occasion: "Vincent, I don't take directives very well."

## COUNT I – VIOLATION OF JUDICIARY LAW SECTION 487

46.     Iannazzo re-alleges and incorporates all of the allegations set forth in paragraphs 1 through 45 as if set forth in full in this Count I.

47.     Section 487 of New York's Judiciary law prohibits all New York attorneys from engaging in deceit that deceives any party or the court in a litigation dispute.  The statute also provides treble damages for violations of the statute.

48.     As alleged in greater detail above, Defendants engaged in a pattern of wrongdoing and deceit directed at Iannazzo by, *inter alia*, misleading him as to the applicable law, repeatedly stating that he does not need corroborating or supporting witnesses for the primary points of contention in the underlying case, telling him they had served an important subpoena when they had not, falsely telling him a witness would be brought before the trial court, falsely characterizing a key exhibit as being in evidence on consent of both sides, and failing to advise Iannazzo of (or otherwise use) damning impeachment evidence that would have undermined Stanson's case.

49.     Defendants' pattern of wrongdoing and deceit was also directed at the Court, which ended up rendering an erroneous ruling because of Defendants' deceit.

50.     As supported by the allegations at paragraphs 34-45, defendants acted with scienter in deceiving their own client.

51.     Iannazzo was a client of Defendants, and therefore acted in reasonable reliance on Defendants' various misrepresentations and material omissions.

52.     As a direct and proximate result of Defendants' various misrepresentations and material omissions, Iannazzo has suffered damages related to a loss of proceeds of the Florida Property, loss of proceeds due under the Buckingham Agreement, loss of ability to purchase a portion of a platinum deposit and related assets, the documentation of which Defendants were preparing on Iannazzo's behalf, the costs related to hiring Defendants and hiring counsel to monitor Defendants, the costs associated with defending a contempt motion that was commenced because of Kazan's negligent advice, emotional and physical damages, and other damages related to the representation.  All told, Iannazzo has been damaged in an amount to be determined at trial, but at least $81 million after trebling.

## COUNT II – LEGAL MALPRACTICE

53.     Iannazzo re-alleges and incorporates all of the allegations set forth in paragraphs 1 through 52 as if set forth in full in this Count II.

54.     Defendants agreed to represent Iannazzo, and Iannazzo had an attorney-client relationship with each defendant.  Defendants therefore had a duty to exercise reasonable care in the representation of Iannazzo.

55.     Defendants' conduct and performance of their duties, including without limitation as alleged above, was conduct below the ordinary and reasonable skill and knowledge commonly possessed by members of the legal profession.

56.     As a direct result of Defendants' legal malpractice, Iannazzo has suffered damages related to a loss of proceeds of the Florida Property, loss of revenue related to proceeds due under the Buckingham Agreement, loss of ability to purchase a portion of a platinum deposit and related assets, the documentation of which Defendants were preparing on Iannazzo's behalf, the costs related to hiring Defendants and hiring counsel to monitor Defendants, the costs

associated with defending a contempt motion that was commenced because of Kazan's negligent advice, emotional and physical damages, and other damages related to the representation. All told, Iannazzo has been damaged in an amount to be determined at trial, but at least $27 million.

## COUNT III – BREACH OF FIDUCIARY DUTY

57.     Iannazzo re-alleges and incorporates all of the allegations set forth in paragraphs 1 through 56 as if set forth in full in this Count III.

58.     Defendants agreed to represent Iannazzo, and Iannazzo had an attorney-client relationship with each defendant. Defendants therefore had a fiduciary duty to Iannazzo.

59.     Defendants' conduct as alleged herein breached their fiduciary duties owed to Iannazzo.

60.     As a direct result of Defendants' breach of fiduciary duty, Iannazzo has suffered damages related to a loss of proceeds of the Florida Property, loss of revenue related to proceeds due under the Buckingham Agreement, loss of ability to purchase a portion of a platinum deposit and related assets, the documentation of which Defendants were preparing on Iannazzo's behalf, the costs related to hiring Defendants and hiring counsel to monitor Defendants, the costs associated with defending a contempt motion that was commenced because of Kazan's negligent advice, emotional and physical damages, and other damages related to the representation. All told, Iannazzo has been damaged in an amount to be determined at trial, but at least $27 million.

## COUNT IV – BREACH OF CONTRACT: INCLUDING REFUND OF LEGAL FEES

61.     Iannazzo re-alleges and incorporates all of the allegations set forth in paragraphs 1 through 60 as if set forth herein in full in this Count IV.

62.   Pursuant to the parties' contractual relationship, Iannazzo has provided money to defendants in compliance with his to pay for legal services which are rendered in a competent fashion.

63.   Through the actions complained of herein, Defendants have breached the parties' retainer agreement.

64.   As a result of said breach, Iannazzo has been damaged in an amount to be determined at trial.  Said damages include without limitation all monies paid by Iannazzo to Defendants, plus interest.

WHEREFORE, Iannazzo respectfully requests that this Court enter judgment in favor of Iannazzo and against Defendants Pitney Hardin LLP, Frederick L. Whitmer, and Barry Mark Kazan as follows:

I.      In respect of Count I, adjudging that Vincent P. Iannazzo be awarded:

(a)     Treble damages against all Defendants in an amount to be proven at trial and pre-judgment interest at the statutory rate;

II.     In respect to Count II, adjudging that Vincent P. Iannazzo be awarded:

(a)     compensatory and punitive damages against all Defendants in an amount to be proven at trial and pre-judgment interest at the statutory rate;

III.    In respect to Count III, adjudging that Vincent P. Iannazzo be awarded:

(a)     compensatory and punitive damages against all Defendants in an amount to be proven at trial and pre-judgment interest at the statutory rate; and

IV.     In respect to Count IV, adjudging that Vincent P. Iannazzo be awarded:

(a)     compensatory and punitive damages against all defendants in an amount to be proven at trial and pre-judgment interest at the statutory rate;

V.    In respect to all Counts, adjudging that Vincent P. Iannazzo be awarded:

    (a)    such other and further relief as this Court deems appropriate.

Dated: September 17, 2004

                                       LAW OFFICE OF DANIEL L. ABRAMS, PLLC

                              By: _____
                                    Daniel L. Abrams (DA 7258)
                                    67 Wall Street, 22nd Floor
                                    New York, New York 100005
                                    (212) 245-1810

                                    Attorney for Plaintiff
                                    Vincent P. Iannazzo